**CALNETICS CORPORATION, Plaintiff,**

v.

**VOLKSWAGEN OF AMERICA, INC., et al., Defendants.**

**No. 70–2185–R.**

United States District Court, C. D. California.

Aug. 1, 1972.

Blecher & Collins, Maxwell M. Blecher, Harold R. Collins, Jr., Gary W. Hoecker, Los Angeles, Cal., Gottlieb & Schwartz,

---

42. Ford Motor Co. v. United States, *supra.*

Bernard Weisberg, Melvin E. Pearl, Chicago, Ill., for plaintiff.

Harry B. Swerdlow, Allan Albala, Swerdlow, Glikbarg & Shimer, Beverly Hills, Cal., for defendant Volkswagen of America, Inc.

Sandler & Rosen, Raymond C. Sandler, Nelson Rosen, Los Angeles, Cal., for defendant Volkswagen Pacific, Inc.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AS TO SECTIONS 1 AND 2, SHERMAN ACT CLAIMS

REAL, District Judge.

### FINDINGS OF FACT

1. Calnetics Corporation ("Calnetics" or "Meierline") is a California corporation engaged in the business, among other things, of manufacturing and selling air conditioners, components and parts thereof, under the brand name "Meierline" for use in automobiles.

2. Defendant Volkswagen of America, Inc. ("VWoA") is a New Jersey corporation. It is a wholly owned subsidiary of Volkswagenwerk A. G., a German manufacturer of automobiles. VWoA imports new vehicles into the United States for sale through fourteen wholesale distributorships set up regionally throughout the United States. Five of these distributorships are wholly owned subsidiaries of VWoA. The remaining nine are independently owned and operated.

3. Volkswagen Pacific, Inc. ("VPI"), a California corporation, is one of the nine independently owned and operated wholesale distributors buying new vehicles from VWoA. It sells to new car dealers franchised by it in Southern California, Southern Nevada, Arizona and Hawaii.

4. Wolkswagen Products, Inc. ("VPC"), a Texas corporation, was formerly known as Delanair Engineering Co., Inc. ("Delanair"). VPC is engaged in the manufacture and sale of air conditioners, components and parts thereof, for use in automobiles. All the stock in VPC was acquired by VWoA on September 26, 1969, and VPC has remained a wholly owned subsidiary during all times material to this litigation.

5. Today VWoA imports into the United States three different makes of automobiles identified by the names "Volkswagen", "Porsche" and "Audi".

6. In addition to importing and selling new automobiles, VWoA also buys and resells a wide variety of parts and accessories. VWoA does not sell automobiles, parts or accessories directly to any dealer but sells only to its franchised wholesale distributors.

7. Three main fields of responsibility are recognized by VWoA and VPI in the operation of their respective businesses, namely, sales, service and parts. "Sales" concerns itself with the sale of new vehicles; "service" is charged with warranty, maintenance and repairs; "parts" is concerned with purchasing and reselling parts and accessories.

8. Although an accessory, like an automobile air conditioner, would normally fall within the jurisdiction of VPI's parts division, air conditioners were early recognized to be in a special category. Because an air conditioner, unlike many other accessories, may directly affect the performance and the operation of the vehicle itself, VPI's service department had a dispositive role in deciding what air conditioners VPI would buy and resell to its franchised new car dealers.

9. Prior to November 1, 1969, Rolf W. Christiansen ("Christiansen"), or "Whitey" Christiansen, was the head of VPI's Service Department and had occupied that position for several years.

10. Christiansen's immediate subordinate was Philip Ballingal ("Ballingal"), who occupied the position of Assistant Service Manager. Another subordinate was Vince Garno.

11. Prior to October, 1968, when the 1969 model year began, VPI bought all its requirements for air conditioners for Volkswagen vehicles from VPC (then

known as Delanair), and from DPD, another air conditioning manufacturers.

12. On July 16, 1968, VPI's Parts Manager, Frank Duffy, wrote VWoA's Vice President for Parts, Mr. Kittel, the following letter reading in part:

"Dear Mr. Kittel:

"It is a well known fact that we have had problems with Delanair Air Conditioners ever since VWoA went into the Air Conditioner program.

"The largest competitor to Delanair has been DPD and while they (DPD) have a reputation of having a unit that is easier to install than Delanair (some dealers oppose this), we still received complaints from dealers who bought Type 3 DPD's from us, when we handled them for a limited time.

"Essentially, what the VW organization is looking for is an Air Conditioner company which has the capacity to manufacture *sufficient units for our needs*. A company with sufficient capital investment to *cover costs of production* of units and a good *parts inventory*. A company with *qualified technicians* and *administrators* with the proper training and background experience in the air conditioning field and one which is *flexible* enough to take care of model changes, modifications and improvements when such are found necessary.

"All of these things cannot be done by a neophyte company. It is only possible with a well-established, well-financed ORGANIZATION with qualified people.

"How many companies in the whole of the United States is capable of complying with these standards? You have, no doubt, looked into alternatives and know more about this than I do, but from where I sit, it seems to me that our best bet is to stay with Delanair (assuming there is no clear-cut alternative) because they do have the personnel, the buildings, the machinery and, presumably, the 'know-how' but to ensure, for the future, better communications, more technicians in the territories to overcome field problems, more training of distributor personnel and more supervision by VWoA personnel to see that the above are carried out."

13. At the time this letter was written, plaintiff was a neophyte company in the air conditioning business, not yet engaged in mass production.

14. In July, 1968, and for some time earlier, Calnetics, through its then president William Sachko, was undertaking activities which would in late 1968 result in the entire production of Calnetics being assigned to VPI directly for distribution to Volkswagen dealers in the VPI marketing area. Mr. Sachko's machinations brought Calnetics to the position as the exclusive supplier for VPI and lost to Calnetics the future potential of marketing its air conditioners with independent automotive accessory distributors.

15. Because of Christiansen's position as head of the VPI Service Department, VPI sought and followed his recommendations regarding automobile air conditioners. In reliance on his recommendation and his advice, the VPI management decided in October, 1968, to cease buying and reselling the VWoA air conditioner and decided to buy and resell the Calnetics air conditioner.

16. Unknown to VPI and even to Calnetics' sales manager in charge of air conditioners, Christiansen had arranged with Calnetics to profit personally from turning VPI's business over to Calnetics.

17. Under date of October 14, 1968, plaintiff memorialized in a letter agreement an earlier oral agreement to pay Christiansen three (3%) percent of the gross proceeds from any sales of air conditioners to VPI. The verbal contract memorialized in the letter was made on October 9, 1968.

18. The letter was not sent to Christiansen at his office in VPI, but was addressed to "RWC Sales Corp." and was mailed to a post office box number belonging to Christiansen.

19. No corporation with the name "RWC Sales Corp." was in existence on October 14, 1968. Such a corporation was not formed until October 28, 1968. According to papers filed with the California Division of Corporations, seventy-five (75%) percent of the shares were issued to and owned by Christiansen and his wife and twenty-five (25%) percent were issued to and owned by Ballingal and his wife.

20. RCW Sales Corp. has been suspended by the Secretary of the State of California for failure to file or pay income tax returns for 1969 or any subsequent year. Its sole purpose was to serve as a cover for plaintiff's payments to Christiansen.

21. The October 14, 1968 letter agreement between Christiansen and plaintiff was subsequently renegotiated on November 4, 1968 and again on January 31, 1969 to clarify and enlarge Christiansen's financial interest in plaintiff's sales of air conditioners for Volkswagen and Porsche vehicles. These subsequent agreements made no change in plaintiff's commitment to pay Christiansen three (3%) percent of the proceeds from the sale of new air conditioning units to VPI.

22. On October 9, 1969, the date of plaintiff's oral agreement to pay Christiansen three (3%) percent on all sales to VPI, Christiansen told VWoA's representatives that Delanair would no longer be distributed by VPI.

23. On October 11, 1968, VPI's parts manager, at the direction of Christiansen, issued a purchase order to plaintiff for nine hundred sixty (960) air conditioning units for Volkswagen vehicles.

24. On October 15, 1968, the date following the written memorialization of the agreement between plaintiff and Christiansen, a bulletin was issued over the signature of Christiansen to all dealers franchised by VPI and to their service managers advising them that effective November 1, 1968 VPI would distribute the Meier-Line air conditioners. The bulletin stated that the decision was "based on the excellent performance of these units in the field."

25. On November 6, 1968, a letter was sent each Volkswagen distributor by Christiansen denigrating VWoA's Delanair unit and urging the purchase of plaintiff's unit from VPI. The letter represented that VPI's decision to buy plaintiff's unit was predicated on an objective evaluation of all competitive air conditioning units.

26. On January 17, 1969, a bulletin was issued to all VPI dealers over the signature of Christiansen advising them that VPI would distribute plaintiff's units exclusively for Volkswagen vehicles and would also be distributing plaintiff's units for Porsche vehicles.

27. The contract between Christiansen and Calnetics was entered into surreptitiously and secretly. The use of a post office box and the creation of RWC Sales Corp. had as their purpose to conceal the underlying arrangements from knowledge of third persons, including VPI and VWoA.

28. Pursuant to plaintiff's agreement with Christiansen, the following payments were made to the latter, through RCW Sales Corporation, based on sales to VPI:

| December 10, 1968 | $ 324.00 |
| January 10, 1969 | 1,350.00 |
| February 7, 1969 | 880.03 |
| March 17, 1969 | 443.72 |
| April 10, 1969 | 444.24 |
| April 21, 1969 | 2,397.59 |
| June 10, 1969 | 2,996.88 |
| July 21, 1969 | 1,662.22 |
| August 11, 1969 | 4,375.69 |
| September 17, 1969 | 776.25 |

29. Some small portion of these payments were given by Christiansen to Ballingal.

30. During the 1969 model year, VPI bought from plaintiff 3,697 air conditioning units and during the calendar year 1969 4,134 units. In consequence of these purchases, plaintiff obtained in the calendar year 1969 approximately 8.-4% of the total air conditioning sales of

Volkswagen and Porsche air conditioners in the United States.

31. As a direct and proximate consequence of the agreement between Christiansen and plaintiff and the payments made to Christiansen in accordance with its terms, competitive suppliers of air conditioners for Volkswagen automobiles, including VWoA, were excluded during the 1969 model year from selling air conditioners to VPI.

32. By October, 1969, when the 1970 model year began, VPI had decided to divide its business between Meier-Line and DPD. Christiansen wrote Duffy a memorandum on October 15, 1969 advising him that 3,500 units would be ordered from each supplier during the 1970 model year.

33. Plaintiff is claiming damages predicated on the market position it enjoyed during the 1969 model year, which began in October, 1968 and ended the following September and during which, in consequence of Christiansen's activities, VPI bought air conditioners exclusively from plaintiff. Plaintiff's theory is that it is entitled to compensation for the fact that its market position and sales have not remained at the level they reached during that model year.

34. Plaintiff is claiming damages on the theory that it is entitled to compensation from defendants for any diminution in its market share below the percentage share it enjoyed during the 1969 model year. Plaintiff has stipulated in open court that its sole theory of damages is predicated upon a projection based upon its sales to VPI during the 1969 model year, all of which sales occurred during the operating period of the Christiansen-Calnetics agreement.

## CONCLUSIONS OF LAW

■ 1. Damages cannot be predicated upon sales on a market position obtained and enjoyed by reason of such conduct. Because of the source of plaintiff's sales during the 1968–1969 season, they cannot support a claim for damages.

■ 2. The agreement described above between Calnetics Corporation, plaintiff herein, and RCW Sales Corporation creates a conflict of interest between Mr. Christiansen and his then-employer, Volkswagen Pacific, Inc. and all sales made by plaintiff's corporation during 1969 to Volkswagen Pacific, Inc. are thus, inadmissible for purposes of proving the damages allegedly sustained by plaintiff thereafter.

Based upon the findings of fact and conclusions of law enumerated above;

It is hereby ordered, adjudged and decreed as follows:

1. The previous denial of the motions for summary judgment by defendants VWoA and VPC, filed on February 18, 1972 and May 15, 1972, are hereby vacated as to plaintiff's claims under Sections 1 and 2 of the Sherman Act [15 U.S.C. § 1, 2].

2. Each of said motions are hereby granted.

3. The trial date of July 11, 1972 is hereby vacated.