**CALNETICS CORPORATION,**
Plaintiff,

v.

**VOLKSWAGEN OF AMERICA,**
**INC., et al., Defendants.**

No. 70–2185–R.

United States District Court,
C. D. California.

Jan. 19, 1973.

Blecher & Collins, Maxwell M. Blecher, Harold R. Collins, Jr., Gary W. Hoecker, Los Angeles, Cal., Gottlieb & Schwartz, Bernard Weisberg, Melvin E. Pearl, Chicago, Ill., for plaintiff.

Harry B. Swerdlow, Allan Albala, Swerdlow, Glikbarg & Shimer, Beverly Hills, Cal., for Volkswagen of America.

Sandler & Rosen, Raymond C. Sandler, Nelson Rosen, Los Angeles, Cal., for Volkswagen Pacific.

## SUPPLEMENTAL MEMORANDUM OPINION AND ORDER

REAL, District Judge.

The acquisition by Volkswagen of America, Inc. (hereinafter referred to as VWoA) of the air conditioning business of Delanair [1] on September 26, 1969 was found by the Court to be in violation of the antitrust laws of the United States, Sections 4, 7 and 16 of the Clayton Act [15 U.S.C. §§ 15, 18, 26]. That decision filed June 30, 1972, Calnetics v. Volkswagen of America, Inc., D.C., 348 F.Supp. 606, left for consideration the scope of the equitable relief to be granted to restore the competitive marketplace in air conditioners for Volkswagen automobiles.

The parties have been given the opportunity to present evidence and to fully argue to the Court the appropriate relief to be granted to overcome the anticompetitive effects of the acquisition. ▮▮▮ VWoA has continued to oppose divestiture upon the ground that it —in the guise of VPC—is building the best available air conditioner for Volkswagen automobiles.[2] As compelling as

---

1. Delanair Engineering Co., Inc. has since changed its name to Volkswagen Products Corp. (hereinafter referred to as VPC).

2. Volkswagen automobiles as used in the context in which VWoA presents its position to the Court includes Type I— the commonly referred to "bug" or "beetle" and Karmann Ghia; Type II— the bus or van; Type III—the fastback or squareback; Porsche 911, Porsche 912 and Audi in its various models.

Also included in any use herein of the "Volkswagen automobile" appellation is any successor or replacement model of automobile manufactured or produced in whole or in part by Volkswagen Werk A.G., its successors or assigns.

that approach may seem, if the market we were considering was the automobile sales of VWoA, it simply misses the mark completely in the consideration that relief from an antitrust violation must be effective in the restoration of the competition affected by the merger or acquisition. United States v. du Pont & Co., 366 U.S. 316, 81 S.Ct. 1243, 6 L. Ed.2d 318 (1961); Ford Motor Company v. United States, 405 U.S. 562, 92 S. Ct. 1142, 31 L.Ed.2d 492 (1972). That competition is air conditioners for Volkswagen automobiles. Calnetics v. Volkswagen of America, Inc., *supra*, 348 F. Supp. at 617–618. Competition in air conditioners must be restored, maintaining the divested company as a viable competitor in the marketplace without the aid of the protective practices of a parent who is its sole customer.

■ To attempt to restore competition as it existed prior to the acquisition it is ordered that no later than six (6) months after the judgment herein shall become final,[3] VWoA shall divest itself of all interest in the assets and facilities of VPC for the production and distribution of air conditioners, parts and components thereof. Divestiture shall be accomplished in such manner that VPC and its production facilities shall remain as a going, viable and operating entity producing and distributing automobile air conditioners for Volkswagen automobiles. The divested assets shall include, but not be limited to, all the air conditioners, parts and components production and assembly facilities which were acquired by VWoA from Delanair Engineering Co., Inc. on September 26, 1969, together with all improvements, betterments, replacements and additions made thereto since such acquisition to the date of divestiture.

To guarantee the viability of the divested company, VWoA is required to use its best efforts to maintain the assets of VPC subject to divestiture as a going and viable concern engaging in the production and distribution of automobile air conditioners at the standards of operating efficiency and performance prevailing at June 30, 1972.

Competition, or at least the "competitive climate" the antitrust laws of the United States were enacted to protect, cannot survive in the near vacuum created by the acquisition which is the subject of this action. To provide what protection this Court can to the maintenance of a competitive market and to stabilize competition, VWoA and its wholly owned distributors, together with their respective successors and assigns, are, for a period of ten (10) years from the date of divestiture of the VPC assets, enjoined from manufacturing or assembling automobile air conditioners in the United States or any of its territories.

Plaintiff has proposed as part of the relief to be granted herein the further injunction of the importation into the United States of Volkswagen, Porsche or Audi automobiles having air conditioners installed thereon. VWoA has, nearly five months after plaintiff's proposal, raised for the first time the possibility that any restriction upon the importation of Volkswagen automobiles with air conditioners installed therein would be a violation of treaty obligations with the Federal Republic of Germany, particularly Article 16, Section 1 of the German/American Treaty of October 29, 1954, as well as Art. III, Para. 1 and Article I of the General Agreement on Tariffs and Trade (hereinafter referred to as GATT).[4]

Article XVI, Para. 1 of the German/American Treaty signed October 29, 1954 provides:

"1. Products of either Party shall be accorded, within the territories of the other Party, national treatment and most-favored-nation treatment in

---

3. Not subject to further appeal.

4. This comes in the form of a memorandum from the German Embassy to the U. S. Department of State. [See appended Exhibit A.]

all matters affecting internal taxation, sale, distribution, storage and use."

Article I, Para. 1 of GATT provides:

"1. With respect to customs duties and charges of any kind imposed on or in connection with importation or exportation or imposed on the international transfer of payments for imports or exports, and with respect to the method of levying such duties and charges, and with respect to all rules and formalities in connection with importation and exportation, and with respect to all matters referred to in paragraphs 2 and 4 of Article III, any advantage, favour, privilege or immunity granted by any contracting party to any product originating in or destined for any other country shall be accorded immediately and unconditionally to the like product originating in or destined for the territories of all other contracting parties."

Article III of GATT provides in its pertinent part:

"1. The products of the territory of any contracting party imported into the territory of any other contracting party shall be exempt from internal taxes and other internal charges of any kind in excess of those applied directly or indirectly to like products of national origin. . . .

2. The products of the territory of any contracting party imported into the territory of any other contracting party shall be accorded treatment no less favourable than that accorded to like products of national origin in respect to all laws, regulations and requirement affecting their internal sale, offering for sale, purchase, transportation, distribution, or use. * * * "

The treaty obligations of the United States are given constitutional recognition in Article VI, Clause 2 of the United States Constitution. It provides:

"This Constitution, and the Laws of the United States which shall be made in pursuance thereof, and all Treaties made, or which shall be made, under the authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the contrary not withstanding."

■ Treaties are thus given Supremacy over the Constitution or laws of any State, but the grant of Article VI is only in parity with the Constitution and Congressional enactments made in the exercise of the legislative power granted in Article I. As such the proscriptions of the Clayton Act, Section 7 [15 U.S.C. § 18] are entitled to construction in *pari materia* to any limitations of the treaties now urged upon the Court by defendants.

■ No where in the treaties cited to the Court is there any suggestion that either foreign or domestic business entities may engage in practices which are violative of the antitrust laws of the United States. To accept the position of VWoA that in an effort to stabilize the competition in automobile air conditioners for Volkswagen products the Court is prohibited by the cited treaties does not accord with the clear language of these treaties. They deal almost exclusively with *discriminatory* practices concerning the domestic and foreign products of the signatory nations. The Clayton Act, Section 7 [15 U.S.C. § 18] does not—in itself—or as applied by the Court here—discriminate against the products of Germany in favor of United States producers or manufacturers. This judgment is intended to deal with and is aimed at the maintenance of a free, open and competitive market in automobile air conditioners for Volkswagen automobiles. There can be no escape for defendant VWoA in the claim that it is insulated from its violation by any United States treaty with Germany.[5]

Evidence has been presented by VWoA concerning the installation of air

5. This Court does not reach the question of the validity of a treaty that would purport to exempt foreign business from the reach of the antitrust laws of the United States. These treaties just do not approach the problem posed in this case.

conditioning in Volkswagen products at the factory. It is clear that the concern for factory installed air conditioning is of recent vintage prompted largely by this litigation. To permit VWoA to now circumvent the effects of its wrongful conduct by changing only "the name of the game" is neither permissible nor desirable. Consequently for a period of seven (7) years from the date of divestiture of the VPC assets, VWoA and its wholly owned distributors, together with their respective successors and assigns are enjoined from importing into the United States for sale Volkswagen automobiles having air conditioners installed thereon.

 █  Important as it may be, viability of the divested company is only one aspect of a Clayton Act, Section 7 divestiture. The primary purpose of the antitrust laws of the United States is not the survival or demise of a single company but rather the restoration and maintenance of a free competitive environment in which all companies—that can meet the competitive challenge—may have the opportunity to survive. The tool of a judgment—at a single moment in history—is totally inadequate to assure that a divested family member will not become the only supplier to the only real customer of Volkswagen automobile air conditioners. The Court must therefore fashion some flexible standard by which the business needs of a buyer can be compatible with the needs of the various possible suppliers in this market. Reserving to the Court the jurisdiction to amend—upon the presentation of empirical data of the inadequacies of the present limitations—VWoA and its wholly owned distributors, together with their respective successors and assigns shall be limited to procuring from the purchaser of the divested assets of VPC not more than one half of their annual requirements of air conditioners. Annual requirements as used herein shall include the total number of air conditioners actually purchased or otherwise acquired by VWoA and its wholly owned distributors, together with their respec-

tive successors and assigns for resale to their distributors and/or dealers for installation in Volkswagen automobiles or for sale as a separate accessory item.

Divestiture shall be made in such manner that no interest, direct or indirect, shall be acquired or maintained by any officer, director, employee or agent of VWoA, nor to any person or entity that beneficially owns or has the power to vote, or controls, or has rights to own or control more than one percent (1%) of the outstanding shares of stock of VWoA. No transfer of assets of VPC shall be made by VPC to any person or entity in which VWoA or its wholly owned distributors together with their respective successors and assigns has a financial interest of any kind or nature. VWoA, its wholly owned distributor, together with their respective successor and assigns are perpetually enjoined from acquiring or reacquiring control over any of the divested assets.

VWoA shall—upon the negotiation of a sale of the assets herein ordered divested—and within sixty (60) days before the closing date of any sale—report to the Court—in writing and under seal —the name and address of the proposed purchaser together with all the terms and conditions of the proposed sale. VWoA shall simultaneously advise the Court—in writing and under seal—of all offers—and the terms and conditions of such offers—as may have been made by any person or entity for the purchase of the assets ordered divested herein.

Any contract of sale of the assets ordered divested herein shall provide that the person or entity together with their successors or assigns acquiring the divested assets shall not for a period of ten (10) years use the name Volkswagen in its corporate style or use the Volkswagen logo or trademark as part of its marketing efforts for automobile air conditioners. The contract shall further provide that any person or entity together with their successors or assigns acquiring the divested assets shall be bound by the terms of this judgment to-

gether with any additions or amendments hereafter made.

■ As part of the relief sought plaintiff asks payment of its attorneys' fees in successfully prosecuting the Clayton Act, Section 7 aspect of this litigation. The authority for the relief granted plaintiff herein is found in Section 16 of the Clayton Act [15 U.S.C. § 26] which provides in its pertinent part:

"§ 26. Injunctive relief for private parties; exception

Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States . . . ."

Nothing in the statutory scheme for injunctive relief expressly provides for the grant of attorneys' fees. But the statutory provision for injunctive relief does provide for the application of general equitable principles to the determination of the relief to be granted when it goes on to say:

". . . [U]nder the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity . . . . "

Generally American courts have been in accord that attorneys' fees are not recoverable for the equitable aspects of litigation. Allen Bradley Co. v. Local No. 3, International Brotherhood of Electrical Workers, 51 F.Supp. 36 [S.D.N.Y. 1943], rev'd on other grounds 145 F.2d 215 (2d Cir. 1944); Talon, Inc. v. Union Slide Fastener, Inc., 266 F.2d 731 (9th Cir. 1959); Gillam v. A. Shyman, Inc., 205 F.Supp. 534 (D.Alaska 1962); Transworld Airlines, Inc. v. Hughes, 312 F. Supp. 478 [S.D.N.Y.1970]; Semke v. Enid Automobile Dealers Association, 320 F.Supp. 445 (W.D.Okl.1970); Milgram v. Loew's, Inc., 192 F.2d 579 (3d Cir. 1951); Decorative Stone Co. v. Building Trades Council of Westchester County, 23 F.2d 426 (2d Cir. 1928); Alden-Rochelle, Inc. v. American Society of Composers, Authors & Publishers, 80 F. Supp. 888 (S.D.N.Y.1948); Ring v. Spi-na, 84 F.Supp. 403 [S.D.N.Y.1949], modified sub nom. Ring v. Authors' League of America, Inc., 186 F.2d 637 (2d Cir. 1951), cert. denied, 341 U.S. 935, 71 S.Ct. 854, 95 L.Ed. 1363 (1951).

More recent considerations by the Supreme Court of the United States of this most difficult problem indicate that the authorities in general accord upon the denial of attorneys' fees for solely equitable relief are subject to exceptions. Some of the exceptions were articulated in Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967). The principles are summarized when the court says at page 718, 87 S.Ct. at p. 1407:

". . . They have been sanctioned by this Court when overriding considerations of justice seemed to compel such a result."

We must then turn to the nature of the case at hand to determine whether within the broad exception noted in *Fleischmann, supra*, there are "overriding considerations of justice" which should properly permit the assessment of attorneys' fees within the general equity jurisdiction of this Court recognized in the Clayton Act, Section 16 [15 U.S.C. § 26].

No lawyer with any modicum of experience in the trial of antitrust cases can fail to realize that a damage recovery— though conceivable—is highly unlikely in the prosecution of a Clayton Act, Section 7 [15 U.S.C. § 18] violation. The purpose, if any, in prosecuting such a claim is to obtain for the competitor an environment of a free and unencumbered marketplace. If successful the plaintiff secures not only for itself but for all competitors—actual and prospective— the benefits intended in the enactment of the antitrust laws of the United States. This Court recognized the fallout benefit of plaintiff's suit herein when it said:

"Equitable relief presents different considerations. A case for divestiture is one in which a single competitor is but one element in the mosaic of com-

petition. Divestiture affects all of the competitors in the marketplace and so all must be considered in the determination of violation vel non. Section 7 of the Clayton Act [15 U.S.C. § 18] was not enacted to equate 'competition' with 'survival' of a single entity but rather to provide the opportunity to freely enter and engage in the marketplace. In this respect there is no 'target' at which to aim the anticompetitive acquisition. Competitors are, victims of the fallout of the destruction of competition. A viable plaintiff competing in, or ready to enter into the marketplace gives the Court the cause for inquiry. *The inquiry is the marketplace and the effects of the claimed anticompetitive acquisition upon the marketplace. For that reason a Section 7 divestiture plaintiff acts somewhat as a Rule 23 class representative and need not satisfy the requirement of 'impact' in its classical antitrust definition.* In a nation that now exceeds one trillion, forty six billion dollars in gross national product, government cannot possibly be relied upon to provide vindication of every person or entity aggrieved by a violation of the antitrust laws. It must be left to private litigants to guarantee to themselves the assurance that the future will not repeat the past . . . ." (Emphasis added.) Calnetics Corporation v. Volkswagen of America, Inc., 348 F.Supp. 606, 620 (C.D.Cal.1972).

Though discussing a statute providing for attorneys' fees in Civil Rights cases the language of the Supreme Court in Newman v. Piggie Park Enterprises, 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 is particularly apt. The Court there says at page 402, 88 S.Ct. at page 966:

" . . . When a plaintiff brings an action under that Title, he cannot recover damages. If he obtains an injunction, he does so not for himself alone but also as a 'private attorney general', vindicating a policy that Congress considered of the highest priority. If successful plaintiffs were routinely forced to bear their own attorneys' fees, few aggrieved parties would be in a position to advance the public interest by invoking the injunctive power of the federal courts."

Plaintiff herein in the role of "private attorney general" has vindicated a policy of compelling national economic interest —in the prosecution of an action in which this Court has found a violation of the Clayton Act, Section 7 [15 U.S.C. § 18]. The benefit belongs to the marketplace bringing plaintiff's claim for attorneys' fees within the principles of Sprague v. Ticonic National Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939) and the "overriding considerations of justice" stated in *Fleischmann, supra.* VWoA shall pay to plaintiff the sum of $100,000 as its attorneys' fees in the prosecution of this litigation.

Jurisdiction of this cause is retained by this Court to enable the parties to apply at any time for such further orders or directions as may be necessary or appropriate for the construction or execution of this judgment, for modification of any of the provisions thereof, for the enforcement of compliance therewith and the punishment of violations thereof.

VWoA shall pay to plaintiff its taxable costs herein.

This memorandum opinion and order is the judgment and shall be entered by the Clerk accordingly.

### EXHIBIT A

[Text of Memorandum from German Embassy to U. S. Department of State]

German Embassy
Washington, D. C.
Hi/ag

### Note Verbale

The Embassy of the Federal Republic of Germany presents its compliments to the Department of State and has the honor to draw the attention of the De-

partment of State to the following matter:

It has come to the attention of this Embassy that there is presently pending in the U.S. District Court for the Central District of California before Honorable Manuel Real in the case of Calnetics v. Volkswagen of America, Inc. et al. (No. 7o–2185–R), a proceeding which is of concern to citizens and business organizations of the Federal Republic of Germany as well as the German Government.

The Embassy understands that the court in that case has found Volkswagen of America, Inc., the franchise importer of Volkswagen, Audi and Porsche vehicles, has violated section 7 of the Clayton Act on its acquisition in 1969 of the Delanair Corporation, a company which manufactured air conditioners to be installed in VW vehicles as added equipment after importation.

As part of the relief for the violations found by the court, the court is considering to prohibit Volkswagen of America, Inc. for ten years from importing into the United States any Volkswagen, Audi or Porsche vehicles with factory installed air conditioning.

The Embassy has of course no intention to influence the determination of American courts on matters within their competence and therefore limits comment to the proposal mentioned above.

It objects to this proposal which heavily discriminates against German citizens and German industry and, in its opinion, violates Article 16, Section 1, of the German/American Treaty of October 29, 1954 as well as Article III, Para. 1 and Article I of GATT.

To prevent importation of automobiles with factory-installed air conditioners discriminates both against German manufacturers of the vehicles and also German manufacturers of air conditioners for installation in vehicles. To impose the prohibition under consideration by the court would unfairly apply to these manufacturers sanctions in a dispute in which they were not a party.

The Embassy is informed that the decision to which objection is made will be before the court on November 15, 1972.

The Embassy repeats that it has no desire to interfere in a pending procedure before American courts. It would however be grateful if the above mentioned arguments could be brought to the attention of the appropriate authorities.

The Embassy of the Federal Republic of Germany avails itself of this opportunity to renew to the Department of State its assurance of its highest consideration.

Washington, D. C.
November 10, 1972

To the
Department of State