CALNETICS CORPORATION and
Meier-Line, Inc., Appellants,

v.

VOLKSWAGEN OF AMERICA, INC.,
et al., Appellees.

CALNETICS CORPORATION, Appellee,

v.

VOLKSWAGEN OF AMERICA, INC.,
Appellant (five cases).

Nos. 73–1954, 73–1953, 73–1955 to 73–1958.

United States Court of Appeals,
Ninth Circuit.

Feb. 24, 1976.

Rehearing Denied May 17, 1976.

676

Maxwell M. Blecher (argued), of Blecher, Collins & Hoecker, Los Angeles, Cal., for Calnetics.

Cecelia H. Goetz (argued), Herbert Rubin, of Herzfeld & Rubin, New York City, Paul S. Ferber (argued), Los Angeles, Cal., Philip Elman, William R. Weissman, Robert A. Skitol, Mark Schattner, of Wald, Harkrader & Ross, Washington, D. C., Harry B. Swerdlow, Allan Albala, of Swerdlow, Glikbarg & Shimer, P.C., Beverly Hills, Cal., of counsel, for Volkswagen of America, Inc., etc.

G. William Shea (argued), of McCutchen, Black, Verleger & Shea, Los Angeles, Cal., for amicus curiae Porsche.

## OPINION

Before BARNES, CHOY and GOODWIN, Circuit Judges.

### PER CURIAM: *

Volkswagen of America, Inc. (VW), and its wholly owned subsidiary, Volkswagen Products Corporation (Subsidiary), defendants in a private antitrust action brought by Calnetics Corporation,[1] appeal a district court judgment ordering VW's divestiture of Subsidiary and other equitable relief. VW and Subsidiary also appeal a summary judgment dismissing their counterclaims against Calnetics, and an award of attorneys' fees and costs to Calnetics.

Calnetics cross-appeals from summary judgments and a directed verdict dismissing its claims for damages against VW, Subsidiary, and Volkswagen Pacific, Inc. (Distributor), an independently owned corporation which until 1973[2] distributed VW-imported automobiles and accessories in southern California, southern Nevada, Arizona, and Hawaii.

Distributor appeals from the district court's denial of its motion to amend its answer to add a counterclaim under § 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c).

The summary judgment in favor of Calnetics on each of VW's counterclaims is affirmed, as is the summary judgment in favor of Calnetics on Subsidiary's counterclaim based on the Sherman Act, 15 U.S.C. § 1 *et seq.* All other judgments challenged on appeal are reversed. The district court's denial of Distributor's motion to add a counterclaim under 15 U.S.C. § 13(c) is also reversed. The district court's award of attorneys' fees and deposition copy costs to Calnetics is set aside. A legend of the parties and claims appears in the margin.[3]

---

* Because of the number and complexity of the issues, all members of the panel participated in the writing of this opinion.

1. Meier-Line, Inc., a wholly owned subsidiary of Calnetics Corp., was added to the complaint as an additional plaintiff pursuant to an uncontested motion during the district court's hearing on equitable relief. "Calnetics" in this opinion refers both to Calnetics Corp. and to Meier-Line, Inc. Throughout this opinion, for convenience, all actions taken by Meier-Line will be attributed to Calnetics.

2. VW and Subsidiary represent in their brief that Distributor abandoned its distribution franchise in 1973 and that VW now sells directly to the dealers in Distributor's former franchise area.

3. Chart of the causes of action and dispositions:

*Parties:*

VW—Volkswagen of America, the wholly owned subsidiary of Volkswagenwerk, A.G.—handles all American deals.

Subsidiary—Volkswagen Products Corp., an air-conditioning manufacturer acquired by VW.

Calnetics—a competing air-conditioning manufacturer that previously sold to Distributor.

Distributor—Volkswagen Pacific, Inc., an independently owned distributor of VW products—the buyer of the air-conditioning units in this case.

Delta—another air-conditioning manufacturer, not a party to these proceedings.

# Meier-Line—a subsidiary of Calnetics (see note 1, *supra*).

| Complainant | Respondent | Cause of Action | Relief Sought | Disposition | | Location of Discussion in Opinion |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | District Court | 9th Circuit | |
| 1. Calnetics & #Meier-Line | VW, Subsidiary | §7, Clayton | Damages | Directed verdict for VW & Subsidiary | Reversed | I. B. |
| | | | Equitable relief | Divestiture | Reversed | III. C. 1 |
| | | | | Import ban | Questioned | III. C. 3 |
| | | | | Other remedies | Questioned | III. C. |
| 2. Calnetics | VW, Subsidiary | §§ 1, 2, Sherman | Damages | Sum. judg.* for VW & Subsidiary | Reversed | I. D. |
| | | | Equitable relief | Sum. judg.* for VW & Subsidiary | Reversed | I. D. |
| 3. Calnetics | Distributor | §§ 1, 2, Sherman | Both | Sum. Judg. for Distributor | Reversed | I. A. |
| 4. VW, Subsidiary | Calnetics | §§ 1, 2, Sherman §2(c), Clayton | Both | Sum. judg. for Calnetics | Affirmed** | I. C. |
| 5. Distributor | Calnetics | §2(c), Robinson-Patman Pendent claims | Damages? | Denied leave to amend answer so as to assert cause of action | Reversed | V. |
| 6. ........ | ........ | ........ | ........ | Attorney fee for Calnetics | Reversed | IV. A. |
| 7. ........ | ........ | ........ | ........ | Costs for Calnetics | Reversed | IV. B. |

*After vacating an earlier denial of summary judgment for VW and Subsidiary.
**Summary judgment for Calnetics on Subsidiary's non-Sherman Act counterclaims was vacated and remanded.

VW, a wholly owned subsidiary of the German automobile manufacturer (Volkswagenwerk A.G.), imports Volkswagen, Porsche, and Audi automobiles into the United States. On September 26, 1969, VW acquired a manufacturer of automobile air conditioning equipment, and changed its name to Volkswagen Products Corporation (Subsidiary). Approximately one year later, Calnetics, an independent manufacturer of automobile air conditioning equipment which previously sold to Distributor,

brought suit alleging that VW's acquisition of Subsidiary violated § 7 of the Clayton Act, 15 U.S.C. § 18.

The allegation of a § 7 violation was premised mainly on a theory of vertical restraint[4]—that VW would be able to coerce both its wholly owned and indirectly controlled distributors and dealers to satisfy their demand for automobile air conditioning equipment from Subsidiary's supply, thus foreclosing sales opportunities of Calnetics and other independent air conditioning manufacturers (hereinafter referred to generically as "Delta"). Calnetics also alleged that VW, Distributor, and Subsidiary[5] had conspired and combined to restrain competition in the manufacture, distribution, and sale of air conditioning systems for Volkswagen, Karmann Ghia, and Porsche automobiles in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, and had actually monopolized and attempted to monopolize the distribution, manufacture, and sale of air conditioning systems in violation of § 2 of the Sherman Act, 15 U.S.C. § 2.

Calnetics sought both damages and equitable relief, including divestiture of Subsidiary. Its claims for damages under the Sherman and Clayton Acts were premised entirely on its exclusion from competition for the sale of automobile air conditioning equipment to Distributor.

VW and Subsidiary counterclaimed, alleging that a secret agreement between Calnetics and the head of Distributor's service department, R. W. Christiansen, which provided Christiansen and his wholly owned corporation, RWC Sales Corp. with a 3% commission on all sales to Distributor, violated §§ 1 and 2 of the Sherman Act, § 2(c)

of the Robinson-Patman Act,[6] and California state law. VW and Subsidiary sought both damages and equitable relief. Distributor filed a counterclaim based on state law, but was not allowed to amend its answer to include a counterclaim under the Robinson-Patman Act.

On February 28, 1972, the trial court granted Distributor's motion for summary judgment on all claims against it,[7] but rejected motions for summary judgment by VW and Subsidiary. The court also granted Calnetics' motion for summary judgment on the counterclaims brought by VW and Subsidiary.

After the February 28 summary judgments, the only claims remaining to be tried were those by Calnetics against VW and Subsidiary under §§ 1 and 2 of the Sherman Act and § 7 of the Clayton Act. The district court had earlier ordered that the § 7 claim be tried separately from, and prior to, the Sherman Act claims. Accordingly, a jury trial commenced April 4, 1972 on the § 7 claim.

Upon the conclusion of Calnetics' case in chief, the district court directed a verdict in favor of VW and Subsidiary on the issue of damages, dismissed the jury, and proceeded to hear further evidence on Calnetics' claim for equitable relief.

On June 30, 1972, the district court held that VW's acquisition of Subsidiary violated § 7 of the Clayton Act. *Calnetics Corp. v. Volkswagen of America, Inc.,* 348 F.Supp. 606 (C.D.Cal.1972). It granted judgment for Calnetics but deferred the execution of the relief until the parties had presented "plans for accomplishing the [equitable] relief granted * * *." 348 F.Supp. at 623.

---

**4.** In addition to a traditional theory of vertical restraint, Calnetics also urges that the acquisition diminished competition because: (1) as a subsidiary, Subsidiary enjoyed access to more money and engineering talent than it had as an independent company; (2) as a subsidiary, Subsidiary enjoyed the benefits of engineering coordination with the parent automobile manufacturer; and (3) the acquisition eliminated the acquired firm as a potential competitor.

**5.** Calnetics urges that VW and Distributor combined and conspired with Subsidiary's

predecessor corporation prior to Sept. 26, 1969, the date of the acquisition, and with Subsidiary thereafter. Throughout the rest of this opinion, "Subsidiary" will refer both to Subsidiary and to the predecessor corporation.

**6.** 15 U.S.C. § 13(c).

**7.** Having thus eliminated all federal claims between Distributor and Calnetics, the district court dismissed the pendent state law claims between Distributor and Calnetics.

On July 10, 1972, the district court granted summary judgment in favor of VW and Subsidiary on the postponed Sherman Act claims. *Calnetics Corp. v. Volkswagen of America, Inc.,* 348 F.Supp. 623 (C.D.Cal. 1972).

On January 19, 1973, the district court issued a supplemental order which: provided for VW's divestiture of Subsidiary; enjoined VW and its wholly owned subsidiaries for a period of seven years from importing into the United States any Volkswagen, Porsche, or Audi automobiles equipped with factory-installed air conditioning; imposed a 10-year ban on domestic manufacture and assembly of automobile air conditioners by VW; and permanently enjoined VW and its wholly owned distributors from satisfying more than 50% of their need for automobile air conditioners from the output of the divested firm. *Calnetics Corp. v. Volkswagen of America, Inc.,* 353 F.Supp. 1219 (C.D.Cal.1973).

## I. DAMAGE CLAIMS AGAINST VW, SUBSIDIARY, AND DISTRIBUTOR; COUNTERCLAIMS OF VW AND SUBSIDIARY.

VW and Subsidiary argue that all the summary dispositions in their favor and in favor of Distributor are correct. VW and Subsidiary also argue that even if only one of the three summary dispositions in favor of them or Distributor is correct VW and Subsidiary are necessarily entitled to summary dismissal of all the plaintiff's damage claims. Finally, VW and Subsidiary argue that if all three summary dispositions in favor of them or Distributor are erroneous then Calnetics' entire § 7 claim, which sought both damages and equitable relief, must be remanded for a jury trial. With respect to their counterclaims, VW and Subsidiary urge that the summary judgment in favor of Calnetics was erroneous.

Calnetics argues that the three summary dispositions in favor of Distributor, VW, and Subsidiary were erroneous. It does not respond directly, however, to VW and Subsidiary's argument that the consequence of that error is that VW and Subsidiary be- come entitled to a jury trial on the entire § 7 claim. (Calnetics implicitly concedes that the defendants can have a jury trial, because Calnetics asserts error in the summary judgments against Calnetics on the damages claims.)

We consider first Calnetics' challenges to the summary dispositions of its damages claims against VW, Subsidiary, and Distributor. In conjunction with our analysis of these challenges, we will also consider VW's and Subsidiary's challenge to the summary judgment dismissing their counterclaims against Calnetics.

### A. Summary Judgment in Favor of Volkswagen Pacific, Inc., (Distributor) on Calnetics' Antitrust Claims.

Calnetics had alleged that Distributor conspired with VW and Subsidiary (1) unreasonably to restrain trade and commerce in the business of marketing air conditioners for Volkswagen automobiles in violation of § 1 of the Sherman Act, and (2) to monopolize said trade and commerce in violation of § 2 of the Sherman Act. After the submission of numerous documents, depositions, and affidavits, and the presentation of oral and written arguments, the court made extensive findings of fact and concluded that Distributor had not violated the antitrust laws.

The court's critical finding (No. 17) stated:

"* * * By reason of the problems with and dealer complaints received concerning the * * * [Calnetics] air-conditioners, the refusal of many * * * [Distributor] dealers to purchase those units, and the widespread success of * * * [Delta] in the * * * [Distributor] area, in the fall of 1969 * * * [Distributor] determined, in its *independent business judgment* to cease handling * * * [Calnetics] air-conditioners on an exclusive basis and to distribute the full line of * * * [Delta] air-conditioners. This decision reflected a policy decision by * * * [Distributor] that it was in its interests and those of the dealer and Volkswagen purchaser to have a

choice of air-conditioners for each type of automobile." (Emphasis added.)

■ Although the "independent business judgment" finding seems to have been the basis for the court's summary judgment order on February 28, 1972,[8] the court reconsidered finding No. 17 on May 31, 1972, and replaced it with the following:

> " * * * [T]here is no credible evidence that * * * [Distributor's] ceasing to handle * * * [Calnetics] air-conditioners on an exclusive basis or at all was the result of any combination or conspiracy by * * * [Distributor] resulting from its *voluntary* act or acts." (Emphasis added.)

Taking into consideration the February 28 findings along with the May 31 amendments, we conclude that the district court's final rationale for the summary judgment order was *not* that Distributor had exercised independent business judgment in ceasing to handle Calnetics' air conditioners, but that the cessation of business was not the result of a combination or conspiracy resulting from any *voluntary* act on the part of Distributor.

■ In making the May 31 amendment, the court apparently realized that, if the summary judgment in favor of Distributor was based on the independent-business-judgment rationale, it must also grant summary judgment in favor of VW and Subsidiary on the § 7 claim for damages. However, the court did not grant summary judgment in favor of VW or Subsidiary, and, to make its rulings consistent, reconsidered the Distributor findings and amended them so that the Distributor summary judgment would be based on grounds of lack of voluntariness. In doing so, however, the court adopted an erroneous theory. The involuntary nature of one's participation in a conspiracy to monopolize is no defense. An antitrust conspirator can be liable for damages even though he participates only under coercion. *Flintkote Co. v. Lysfjord,* 246 F.2d 368, 375 (9th Cir.), *cert. denied,* 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957); *Otto Milk Co. v. United States Dairy Farmers Cooperative Ass'n,* 261 F.Supp. 381, 385 (W.D.Pa.1966), *aff'd,* 388 F.2d 789 (3d Cir. 1967).

■ Although the court in granting summary judgment misapplied substantive law, the judgment should not be reversed if it is correct for some other reason. *See Archer v. United States,* 217 F.2d 548, 551 (9th Cir. 1954), *cert. denied,* 348 U.S. 953, 75 S.Ct. 441, 99 L.Ed. 745 (1955); 6 J. Moore, Federal Practice ¶ 56.27[1], at 2975 (2d ed. 1948, *as amended,* 1975). Thus, we must reach Distributor's argument that summary judgment was correct because Calnetics failed to produce any credible evidence from which a jury could reasonably infer conspiracy in restraint of trade.[9] According to Distributor, the *only* reasonable inference that could be drawn from the undisputed facts was the one the trial judge first drew: that Distributor ceased doing business with Calnetics for purely independent business reasons.

In support of its claim that a genuine issue exists as to Distributor's motivation, Calnetics points to certain undisputed evidence: (1) that in June, 1969, Distributor issued a 10,000-unit purchase order to Calnetics for the 1970 model; (2) that VW acquired Subsidiary on September 26, 1969; (3) that VW urged Distributor to purchase Subsidiary's air conditioners, but at that time Distributor told VW that it was "satisfied" with its present suppliers; (4) that after an October 15, 1969, meeting between VW, Subsidiary, and Distributor executives, Distributor promised that it would join VW's and Subsidiary's marketing efforts; (5) that Subsidiary could not satisfy the

---

8. It is well settled that an independent business decision to cease doing business with a particular supplier or distributor is lawful. *See, e. g., Scanlan v. Anheuser-Busch, Inc.,* 388 F.2d 918, 921 (9th Cir.), *cert. denied,* 391 U.S. 916, 88 S.Ct. 1810, 20 L.Ed.2d 654 (1968).

9. Distributor, in support of its summary judgment motion, never relied on the lack of voluntariness argument, and in its appellate brief chose to ignore the court's May 31 order and rest its case solely on the ground that no genuine issue of material fact exists.

total air-conditioning demands of Volkswagen dealers in 1970; (6) that in November, 1969, Distributor placed a 1500-unit order to Calnetics, effectively replacing the 10,000-unit purchase order of June; (7) that in early 1970 Distributor notified Calnetics of its intent to cancel the 1500-unit order; (8) that in the beginning of the 1971 model year Subsidiary was "back on the right track"; and (9) that on September 28, 1970, just prior to the 1971 model year, Distributor's service manager wrote to one of its representatives that "[Distributor] is going 100% to Volkswagen Products Corp. [*i. e.,* Subsidiary] air conditioner units for 1971."

Despite Calnetics' arguments to the contrary, the evidence tending to show that Distributor dropped Calnetics as a supplier for purely independent business reasons is substantial and appears strong in comparison with Calnetics' inferences of conspiratorial intent. The dissatisfaction of Distributor and retail dealers with the Calnetics products is well documented, as is Calnetics' rejection of 25% of warranty claims submitted to it, its failure to deliver air conditioners on time, its weak financial condition, and the success of Delta, another manufacturer, in taking business away from Distributor by selling direct to dealers. Further, Calnetics does not dispute the court's finding that Distributor, as a result of the problems it experienced with Calnetics' products, "had no desire to purchase additional * * * [Calnetics] air conditioners * * *." Also tending to show the lack of conspiratorial purpose is the fact that Delta, not Subsidiary, supplied Distributor with the vast majority of the 1970 model-year units which Calnetics claimed it would have supplied but for the conspiracy between VW, Subsidiary, and Distributor.[10]

If this appeal were from a jury verdict in favor of Distributor, our inquiry would be limited to the presence of evidence sufficient to support the verdict. However, the claim against Distributor was never presented to a jury. It was decided by the court on summary judgment. Our inquiry, therefore, is not whether there is substantial evidence supporting a finding of independent business purpose, but whether no reasonable jury could have found that Distributor participated in a conspiracy to restrain trade. The burden is on the party moving for summary judgment to show the absence of any genuine issue of material fact,[11] and, in determining whether the burden has been met, we must draw all inferences of fact against the movant and in favor of the party opposing the motion. *Fortner Enterprises, Inc. v. United States Steel Corp.,* 394 U.S. 495, 505, 89 S.Ct. 1252, 1259, 22 L.Ed.2d 495, 506 (1969); *DeVoto v. Pacific Fidelity Life Ins. Co.,* 516 F.2d 1, 5 (9th Cir.), *cert. denied,* 423 U.S. 894, 96 S.Ct. 194, 46 L.Ed.2d 126 (1975); *Saxony Products, Inc. v. Guerlain, Inc.,* 513 F.2d 716, 719 n.6 (9th Cir. 1975).

These general standards for the granting of summary judgment become even more strict in the antitrust context. As the Supreme Court observed in *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962):

> " * * * We believe that summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot * * *. It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of 'even hand-

---

10. The extent to which Delta and not Subsidiary replaced Calnetics as a supplier to Distributor is also critical to a determination of damages, if any, suffered by plaintiff. See Part B, *infra.*

11. Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56.

ed justice.'" 368 U.S. at 473, 82 S.Ct. at 491, 7 L.Ed.2d at 464.

The key contested issue in the claims against Distributor is motive or intent, and plaintiff should have an opportunity to let the jury draw its own inferences from the undisputed facts unless all reasonable inferences that could be drawn defeat plaintiff's claims. Despite cogent evidence of independent business reasons for Distributor's actions, the fact remains that VW enjoyed a special supplier-purchaser relationship with Distributor and that, in the two model years after VW's acquisition of Subsidiary, the Subsidiary air conditioners—considered unfit when they were produced by Subsidiary's predecessor corporation—made substantial inroads into the Distributor market which had been held exclusively by Delta and plaintiff.

■■■ Mindful of the Supreme Court's admonition in *Poller v. Columbia Broadcasting System, Inc., supra,* and viewing the evidence as a whole and in a light most favorable to Calnetics, we cannot say that no reasonable jury could have found that Distributor participated in a conspiracy in restraint of trade which resulted in a decision to terminate dealings with plaintiff.[12] Thus, a genuine issue of material fact exists and it is for the jury alone to decide whether Distributor's cessation of business with Calnetics was motivated by independent business reasons or by participation in an illegal conspiracy.[13]

We vacate the summary judgment in favor of Distributor on Calnetics' antitrust claims, and remand the case for trial.

**B. Directed Verdict in Favor of VW and Subsidiary on the Clayton Act § 7 Claim for Damages.**

At the conclusion of Calnetics' case in chief on its claim for damages under § 7 of the Clayton Act, the court granted defendant VW's motion for a directed verdict. The court based its ruling upon its finding that the jury could not reasonably have found a direct and immediate causal connection between VW's acquisition of Subsidiary and Calnetics' alleged damages.

■■■ The standard for review of the grant of a directed verdict is identical to that for review of a summary judgment order. The appellate court must view the evidence, including all reasonable inferences of fact, in a light most favorable to the party against whom the motion for directed verdict was made. *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 696, 82 S.Ct. 1404, 1409, 8 L.Ed.2d 777, 782 (1962); 5A J. Moore, Federal Practice ¶ 50.02[1], at 2326–27 (2d ed. 1948, *as amended* 1975).

The order for a directed verdict does not clearly indicate the facts upon which the court based its lack-of-causation finding. Conceivably, the court entered its order upon the belief that the evidence conclusively showed that Distributor's termination of business dealings with plaintiffs resulted from the exercise of independent business judgment rather than from participation in a conspiracy. But, as pointed out by VW and Subsidiary, at the time the court ordered a directed verdict, there had been only oblique reference to independent busi-

---

**12.** As discussed in Part B, *infra,* another reasonable conspiracy theory that the jury should have an opportunity to consider is that Distributor's initial decision to drop Calnetics was for independent business reasons, but that once Subsidiary was rehabilitated the unlawful foreclosure commenced and Calnetics was prevented by the conspiracy from re-entering the market. If the jury so finds, damages must be calculated from the moment of foreclosure rather than from the date of the acquisition.

**13.** The fact that the trial court did not grant summary judgment in favor of VW and Subsidiary on Calnetics' § 7 claims tends to indicate that the court also concluded that a genuine

issue of fact existed as to the reason for Distributor's dropping of Calnetics as a supplier. In any event, Calnetics' evidence of conspiracy is not so insubstantial as to warrant summary judgment against it.

To avoid inconsistent results, the district court should bear in mind that the § 7 damage claims and the Sherman Act claims against Distributor, VW, and Subsidiary are all interrelated. Consequently, a jury finding that Distributor made an independent, *long-term* business judgment to cease doing business with plaintiffs would defeat each and every one of plaintiff's damage claims.

ness reasons for Distributor's actions. Therefore, according to VW and Subsidiary, the court must have based its lack-of-causation conclusion on the fact that Calnetics was displaced as Distributor's supplier not by Subsidiary but by Delta. Since we have already concluded that a genuine issue exists as to Distributor's motivation in terminating its business dealings with Calnetics, the directed verdict in favor of VW and Subsidiary can stand only if no reasonable jury could have found that Subsidiary was responsible for *any* of plaintiff's alleged losses.

In model year 1969, Calnetics sold approximately 4000 units to Distributor, while Delta, selling at that time directly to Volkswagen dealers, sold no units to Distributor. Then, in the fall of 1969, Distributor stated that it would use both Calnetics and Delta as exclusive suppliers for the coming model year. Subsequently, on October 30, 1969, soon after VW's acquisition of Subsidiary, Distributor did order 125 air-conditioner units from Subsidiary. In the months immediately following, additional units were sold by Subsidiary to Distributor, but not in the quantity delivered by Calnetics and Delta. From October 1969 through April 1970, Calnetics supplied 1800 units, Delta 1643, and Subsidiary 460. After April 1970, Subsidiary's sales to Distributor picked up dramatically, and Subsidiary's total sales to Distributor for 1970 amounted to 2024 units. Delta meanwhile sold a total of 4225 units to Distributor in 1970. In contrast to Delta's good sales year, Calnetics sold no additional units to Distributor after April 1970.

In viewing the above evidence, the parties take extreme positions. According to defendants VW and Subsidiary, the evidence proves conclusively that Delta alone displaced Calnetics and, thus, no damages whatsoever resulted from the challenged acquisition; plaintiff Calnetics, on the other hand, boldly claims that but for the acquisition it would have sold Distributor 4800 units in 1970 and another 6500 units in 1971.

■ Distributor's dissatisfaction with Calnetics' air conditioners and its reliance on Delta as its primary supplier for 1970 provide evidence that Calnetics was not in any way foreclosed from the Distributor market by a conspiracy among VW, Subsidiary, and Distributor. However, viewing all the evidence in a light most favorable to plaintiff, we cannot say that no reasonable jury could have found at least some damages resulting from the acquisition.

■ In the first place, a jury could have found that some of Subsidiary's sales to Distributor for the 1970 and 1971 model years were made only as a result of conspiratorial conduct and were made at the expense of Calnetics. Further, even if a jury were to conclude that Subsidiary did not foreclose Calnetics from the Distributor market in the months immediately following the acquisition, we cannot say that no jury could have found an unlawful foreclosure commencing at a later time.[14] The fact, if it is a fact, that the alleged foreclosure here may not have taken effect until after the rehabilitation of Subsidiary or at some other time does not bar a claim for damages for the "postponed" foreclosure. *Cf. United States v. E. I. duPont de Nemours & Co.,* 353 U.S. 586, 597, 77 S.Ct. 872, 879, 1 L.Ed.2d 1057, 1069 (1957). Of course, damages must be calculated from the time the foreclosure commenced rather than from the time of acquisition.

■ As for plaintiff's claim that it would have sold 4800 units to Distributor in 1970 and 6500 in 1971, on retrial plaintiff's recovery, if any, must be limited to damages suffered as a result of sales lost *to the alleged coconspirator-supplier* (Subsidiary). Calnetics alleges that but for the conspiracy it would have sold Distributor about 3000 more units in 1970 than it actually sold. This is obviously wrong, because Subsidiary's total sales to Distributor in 1970 amounted to only 2024 units. Assuming *arguendo* that Calnetics can prove a conspiracy in restraint of trade which resulted

14. *See* note 12, *supra.*

in Distributor's purchasing Subsidiary's units, Calnetics nonetheless may not recover from Distributor for sales lost to an innocent competitor (Delta).[15] The requirement that causation be proved for damages means that Calnetics may not recover on a calculation of lost sales in a given year exceeding sales made by Subsidiary to Distributor in that same year. Thus, for example, damages in 1970 may not be based on lost sales in excess of 2024 units—the number of units Subsidiary sold to Distributor.

VW and Subsidiary make an alternative argument that, even if causation was proved, the evidence of damages was too unreliable and speculative to allow recovery. Except as to the causation problems discussed *supra,* we believe that a discussion of the adequacy of evidence of damages is premature.[16]

The directed verdict was error. We vacate the judgment based on it, and remand the § 7 claim for a jury trial.

C. *Summary Judgments in Favor of Calnetics on VW's and Subsidiary's Counterclaims.*

The defendants' counterclaims had all been predicated on the commission arrangement between Christiansen (Distributor's service manager) and Calnetics. In entering summary judgment in favor of Calnetics, the court found:

" * * * That the decision by defendant Volkswagen Pacific, Inc. [the Distributor] to discontinue the promotion of the * * * [Subsidiary] air-conditioning systems was not causally related in any way to the entering into a sales commission agreement between plaintiff and * * * [Christiansen]."

As was the case with Distributor's decision to drop Calnetics as a supplier in

1970,[17] the facts surrounding the decision to drop Subsidiary in 1968 are complex and subject to various interpretations. The district court itself was apparently confused by the contradictory claims and conflicting evidence of the opposing parties. It was led into making two totally inconsistent findings as to the causal relationship between the agreement and Calnetics' sales. The counterclaim finding quoted above cannot be reconciled with finding No. 31, entered on August 1, 1972, when the court dismissed Calnetics' Sherman Act claims: [18]

" * * * As a direct and proximate consequence of the agreement between Christiansen and plaintiff and the payments made to Christiansen in accordance with its terms, competitive suppliers of air conditioners for Volkswagen automobiles, including [VW], were excluded during the 1969 model year from selling air conditioners."

Considering the trial court's own difficulty with this important factual dispute and viewing the evidence in a light most favorable to the parties opposing the summary judgment (VW and Subsidiary), we conclude that a genuine issue as to causation exists.

It is undisputed that Christiansen, who was Distributor's service manager from 1967 to November 1969, entered into a written agreement in the fall of 1968 providing *inter alia* that his newly-formed company, RWC Sales Corporation, would receive a three percent commission on all sales of Calnetics' units to Distributor. However, the exact sequence of events in the summer and fall of 1968 and the effect of the commission agreement are not so clearly established in the documents on file that a jury trial is unnecessary. Although credible evidence suggests that the agreement was not consummated until fall, 1968, and not until *after* the Calnetics order was placed by

---

**15.** Delta has not been charged with nor connected in any way with a conspiracy in restraint of trade. Delta has instituted its own antitrust suit against defendants based on an alleged unlawful foreclosure from the air-conditioner market.

**16.** Plaintiffs may base damages figures on 1969 model-year sales, even assuming *arguendo* that they were "illegal" sales. *See* Part I. D., *infra.*

**17.** *See* Part I. A., *supra.*

**18.** *See* Part I. D., *infra.*

Distributor, the evidence is far from conclusive. Christiansen and a Calnetics executive did in fact meet during the summer of 1968, and a reasonable inference, considering the signing of the actual agreement just a few months later, is that the commission agreement was hammered out during the summer.[19]

Further, a genuine fact issue exists as to the date on which Distributor made its decision to order Calnetics' units for the 1969 model year. If that decision was made prior to the consummation of the Christiansen agreement, a causal gap exists in defendants' facts. However, a jury might infer that the commission agreement and Distributor's decision to purchase Calnetics' products ripened together. And, even if initial 1969 orders were made prior to the Christiansen agreement, a jury might find that Calnetics maintained its position in the volatile air-conditioner market to Subsidiary's detriment because of the commission agreement.

Subsidiary's units, like those of the competing brands, were not completely satisfactory to Distributor, and Distributor may have dropped Subsidiary for purely independent business reasons. However, it is for the jury in a plenary trial, not the judge in a summary proceeding, to determine Distributor's motivation and the sequence of events leading up to Distributor's decision. For this reason, the counterclaim should not have been dismissed in its entirety. However, another ground does exist which compels partial dismissal.

 An issue that may be renewed upon trial was raised by the summary judgment order against VW and Subsidiary. The court held that defendants' first counterclaim failed to state a claim for relief under §§ 1 and 2 of the Sherman Act. We agree. VW's and Subsidiary's claim of commercial bribery, standing alone, does not constitute a violation of the Sherman Act.[20] *Sterling Nelson & Sons, Inc. v. Rangen, Inc.,* 235 F.Supp. 393, 400 (D.Idaho 1964), *aff'd on other grounds,* 351 F.2d 851 (9th Cir. 1965), *cert. denied,* 383 U.S. 936, 86 S.Ct. 1067, 15 L.Ed.2d 853 (1966); *cf. United States v. Boston & Maine R.R.,* 380 U.S. 157, 162, 85 S.Ct. 868, 13 L.Ed.2d 728 (1965); *Norville v. Globe Oil & Refining Co.,* 303 F.2d 281, 282–83 (7th Cir. 1962). As the district court stated in *Sterling Nelson:*

> "The evidence here proves only bribery of an influential state employee which had a detrimental restraining effect upon interstate commerce. This is not the type of misconduct within the purview of the concepts of a combination in restraint of trade or monopoly as used in the Sherman Act ·* * *. [T]he Sherman Act must be interpreted in the light of well understood common law doctrines relating to monopolies and restraints of trade such as contracts for the restriction or suppression of competition in the market, agreements to fix prices, divide marketing territories, apportion customers, restrict production and the like. Nothing of that kind occurred here. This is a simple case of buying influence, sometimes called commercial bribery * *."
> 235 F.Supp. at 400.

VW's and Subsidiary reliance on the Ninth Circuit opinion in *Sterling Nelson* for the proposition that antitrust claims may be based on commercial bribery is misplaced. This court decided merely that, according to congressional intent,[21] a claim under *§ 2(c) of the Clayton Act* could be based on commercial bribery. 351 F.2d at 858. The district court holding in *Sterling Nelson* that Sherman Act claims may not be predicated on commercial bribery was never presented to the Ninth Circuit for review, plaintiffs

---

19. *See* finding No. 14. 348 F.Supp. at 625.

20. This case does not present the question nor do we here decide under what circumstances a claim of commercial bribery tied to claims of other acts tending to restrain trade would state a cause of action under §§ 1 and 2 of the Sherman Act.

21. *See FTC v. Henry Broch & Co.,* 363 U.S. 166, 169–70 n.6, 80 S.Ct. 1158, 1161, 4 L.Ed.2d 1124, 1128 (1960), *citing* 80 Cong.Rec. 7759–60, 8111–12.

there having failed to cross-appeal from the dismissal of their Sherman Act claims.

█ The district court also based its summary dismissal of VW's counterclaims on the alternative ground that VW could not establish any damages flowing from the alleged Christiansen-Distributor commission agreement. That ruling is amply supported by the unequivocal testimony of VW's president, J. Stuart Perkins, that VW's expenses in distributing Subsidiary units would "eat up" any anticipated profit resulting from buying the units at one price and reselling them at a higher price. Because this testimony is undisputed and credible, and because VW has failed to point to any evidence tending to show that a genuine issue exists as to VW's damages, we affirm the summary judgment as to VW's counterclaims. However, a genuine issue of material fact remains as to the amount, if any, of Subsidiary's damages.

The summary judgment in favor of Calnetics on each of VW's counterclaims is affirmed for lack of proof of injury to VW. The summary judgment in favor of Calnetics on Subsidiary's counterclaim based on the Sherman Act is affirmed, but the summary judgment in favor of Calnetics on Subsidiary's other counterclaims is vacated and those claims are remanded for trial.

D. *Summary Judgment in Favor of VW and Subsidiary on the Sherman Act Claims.*

The district court granted summary judgment against Calnetics on its Sherman Act claims because Calnetics had entered into an illegal commission agreement with Christiansen which resulted in sales by Calnetics to Distributor in 1969. The court held that these sales were inadmissible for the purpose of proving damages. Without

the use of the 1969 sales figures, Calnetics was unable to frame a damages study to show anticipated sales for 1970 and 1971.

█ The district court committed both a factual and a legal error in granting this partial summary judgment. As noted, a genuine issue of material fact exists as to the cause-and-effect relationship between the Christiansen commission agreement and Calnetics' sales to Distributor during the 1969 model year.[22] More important, the district court erred in ruling that because the 1969 sales resulted from an unlawful agreement they could not be admitted in evidence as a basis for calculating Calnetics' damages. Admissibility is one thing: weight and probative value another. The evidence may be weakened as to its value, but it is not categorically inadmissible.

Defendants' challenge to Calnetics' reliance on the 1969 sales figures is in effect an *in pari delicto* or "unclean hands" defense, which is not a defense in an action for treble damages. *Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 140, 88 S.Ct. 1981, 1985, 20 L.Ed.2d 982, 990 (1968); *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.,* 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951).

The *Perma Life* rule is firmly based on public policy grounds. As the Supreme Court stated:

" * * * [T]he purposes of the antitrust laws are best served by insuring that the private action will be an ever-present threat to deter anyone contemplating business behavior in violation of the antitrust laws. The plaintiff who reaps the reward of treble damages may be no less morally reprehensible than the defendant, but the law encourages his suit to further the overriding public poli-

**22.** Defendants themselves concede that a genuine issue of fact exists as to causation. In arguing that the district court erred in entering summary judgment against them on their counterclaims, VW and Subsidiary note in their briefs that "[o]nly a jury can decide the relationship in time between Christiansen's expectation of a share in plaintiff's revenues from sales to * * * [Distributor] and * * *

[Distributor's] decision to distribute plaintiff's units."

Further, the court's inconsistent causation findings in the summary judgment order in favor of VW and Subsidiary on the Sherman Act claims and in the summary judgment order in favor of Calnetics on the counterclaims suggests that the complexity of the evidence precludes use of summary procedures.

cy in favor of competition. A more fastidious regard for the relative moral worth of the parties would only result in seriously undermining the usefulness of the private action as a bulwark of antitrust enforcement. And permitting the plaintiff to recover a windfall gain does not encourage continued violations by those in his position since they remain fully subject to civil and criminal penalties for their own illegal conduct." 392 U.S. at 139, 88 S.Ct. at 1984, 20 L.Ed.2d at 990.

Contending that their defense is not one of *in pari delicto* or unclean hands, and is thus not barred by *Perma Life*, defendants argue that they are not challenging Calnetics' *right* to bring an antitrust action but merely its reliance on *illegal* sales for proof of damages. *See* E. Timberlake, Federal Treble Damage Antitrust Action § 21.10, at 326–28 (1965).[23] Labels, however, are not controlling,[24] and we find no legitimate reason for distinguishing defendants' "illegal sales" argument from the *in pari delicto* type of defense struck down in *Perma Life*.

From a practical point of view, Calnetics is in a position no different from that of the plaintiff in *Purex Corp. v. General Foods Corp.*, 318 F.Supp. 322 (C.D.Cal.1970), who had acquired an antitrust cause of action by virtue of an acquisition which was itself illegal. Recognizing the asserted defense of illegality as a species of *in pari delicto*, the *Purex* court rejected it. VW's and Subsidiary's defense is also strikingly similar to that rejected by the Tenth Circuit in *Semke v. Enid Automobile Dealers Ass'n*, 456 F.2d 1361 (10th Cir. 1972). In *Semke*, the plaintiff, an unlicensed dealer in new cars, brought suit against an automobile dealers' association for its interference with his

business efforts. Citing *Perma Life*, the court refused to let defendant argue that plaintiff's whole business operation was illegal because he was in violation of state licensing statutes designed to protect the public from unscrupulous automobile dealers. The plaintiff, the court found, was entitled to prove damages his business suffered, even though at the time of injury plaintiff may have been illegally engaged in the automobile retail business. 456 F.2d at 1370. *See also Adolf Coors Co. v. A & S Wholesalers, Inc.*, 1975–1 CCH Trade Cases ¶ 60,187, at 65,626, 65,631 (D.Colo.1975).

Similarly, if Calnetics proves that defendants unlawfully foreclosed it from the Distributor market in 1970 and 1971, it is entitled to recover damages actually suffered even though the market position from which Calnetics was displaced had been attained only through illegal conduct. To rule otherwise would effectively frustrate the important public policy underlining the antitrust laws: encouragement of private antitrust suits in order to deter the illegal exercise of market power. *See Lanier Business Products v. Graymar Co.*, 355 F.Supp. 524, 526 (D.Md.1973). By allowing Calnetics to base its proof of damages on its 1969 sales, even assuming *arguendo* their illegality, we are not giving a green light to companies to violate the law against commercial bribery. As stated in *Perma Life*, antitrust violators "remain fully subject to civil and criminal penalties for their own illegal conduct." 392 U.S. at 139, 88 S.Ct. at 1984, 20 L.Ed.2d at 990. The fact that Calnetics is itself *not immune from liability* is underlined by Subsidiary's counterclaim for damages which, if sustained, will force Calnetics to disgorge any gains shown to be ill-gotten.

---

**23.** As stated by Timberlake:

"This [refusal to consider ill-gotten gains as a basis of damages] is not a pari delicto defense, nor is it a defense that plaintiff was otherwise violating the antitrust laws * *. It is simply that profits made in the 'before' period, when plaintiff was the beneficiary of the unlawful acts, are not proper evidence upon which to predicate lost profits in the 'after' period." E. Timberlake, Federal Treble Damage Antitrust Action § 21.10, at 326.

However, Timberlake's argument should be read in light of the fact that his treatise was written three years before the Supreme Court's opinion in *Perma Life*. Further, *Victor Talking Machine Co. v. Kemeny*, 271 F. 810, 819 (3d Cir. 1921), upon which Timberlake primarily relies, was decided long before the trend against the use of the *in pari delicto* defense in antitrust suits took hold.

**24.** *See Waldron v. British Petroleum Co., Ltd.*, 231 F.Supp. 72, 90–92 (S.D.N.Y.1964).

The summary judgments in favor of VW and Subsidiary on the Sherman Act claims are vacated.

## II. EFFECT OF REVERSAL OF SUMMARY DISPOSITIONS IN FAVOR OF VW, SUBSIDIARY, AND DISTRIBUTOR ON THE CLAYTON ACT JUDGMENT AWARDING EQUITABLE RELIEF.

■ In its complaint, Calnetics demanded a jury trial. VW, Subsidiary, and Distributor were entitled to rely on this demand, and were not obliged to make an independent demand with respect to the issues covered by Calnetics' demand in order to preserve their right to trial by jury under Fed.R.Civ.P. 38. *See* 5 J. Moore, Federal Practice ¶ 38.39[1], at 312; ¶ 38.45 (2d ed. 1948, *as amended* 1975).

Trial by jury of Calnetics' § 7 claim commenced on April 4, 1972, but was interrupted by a directed verdict on the issue of damages at the close of Calnetics' case. After granting the directed verdict the court dismissed the jury, over objections by VW and Subsidiary. The court then heard evidence on the remaining equitable claims, held that the acquisition of Subsidiary violated § 7 of the Clayton Act, and ordered divestiture.

Calnetics does not directly argue with VW's and Subsidiary's contention that, if the directed verdict and other summary dispositions in favor of VW and Subsidiary were erroneous, the defendants are entitled to a jury trial on remand of the entire § 7 claim, but a new trial makes it necessary to decide this point.

■ The Supreme Court held in *Ross v. Bernhard*, 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970), that "where equitable and legal claims are joined in the same action, there is a right to jury trial on the legal claims which must not be infringed either by trying the legal issues as incidental to the equitable ones or by a court trial of a common issue existing between the claims * * *." 396 U.S. at 537–38, 90 S.Ct. at 738, 24 L.Ed.2d at 736. Prior nonjury trial of the equitable claims may infringe the right to jury trial on the legal claims because of the collateral estoppel or *res judicata* effect of a prior judicial determination of issues common to the two sets of claims. *Heyman v. Kline*, 456 F.2d 123, 130 (2d Cir.), *cert. denied*, 409 U.S. 847, 93 S.Ct. 53, 34 L.Ed.2d 88 (1972).

■ VW and Subsidiary are entitled to a jury determination of the Clayton Act claim for damages; this right may not be infringed by a prior judicial determination of the equitable claim. If the district court's determination that the acquisition violated § 7, made in the context of a nonjury trial of the equitable claims, were allowed to stand it would bind VW and Subsidiary in subsequent proceedings. Because the damages claim under § 7 remains outstanding as the result of our reversal of the § 7 directed verdict, the prior determination of a § 7 violation would infringe VW's and Subsidiary's right to a jury trial of the damages claim. Accordingly, the district court's judgment holding that the acquisition violated § 7 must be vacated.[25] The entire § 7 claim must be remanded for a jury trial. If, on remand, the jury determines that the acquisition did not violate § 7, that determination will preclude equitable relief.[26] If the jury determines that the acquisition did violate § 7, the trial judge must then go on to decide whether Calnetics is entitled to equitable relief under the standards of § 16 of the Clayton Act, 15 U.S.C. § 26.

---

**25.** Calnetics did not offer to waive the collateral estoppel effect of the § 7 equitable determination on remand. But even if it had, we would be inclined to remand for a consolidated trial because of the threat of inconsistent determinations. *See Heyman v. Kline*, 456 F.2d 123, 131 (2d Cir.), *cert. denied*, 409 U.S. 847, 93 S.Ct. 53, 34 L.Ed.2d 88 (1972).

**26.** This is so because Calnetics' request for equitable relief, as well as its claim for damages, is based on the theory that the acquisition constituted a violation of § 7. Accordingly, the jury's resolution of the violation issue will control both sets of claims.

## III. VW'S AND SUBSIDIARY'S ARGUMENTS ON THE MERITS OF THE § 7 HOLDING AND RELIEF.

Our resolution of the jury-trial issue makes it unnecessary to deal either with VW's and Subsidiary's challenges to the merits of the district court's holding that the acquisition violated § 7 of the Clayton Act or with their challenges to the equitable relief granted by the district court. Nevertheless, in the interest of judicial economy, it is appropriate to comment briefly on challenged rulings that are likely to recur. On the other hand, our failure to discuss other issues raised by VW and Subsidiary does not indicate approval or disapproval of rulings made below.

### A. Definition of Product Market.

In defining the product market, the district court explicitly refused to consider the cross-elasticity of production facilities or capacity. *Calnetics Corp. v. Volkswagen of America, Inc.*, 348 F.Supp. at 618. VW and Subsidiary argue that this refusal rendered the ensuing market definition—"air conditioners sold for use in the Volkswagen family of automobiles," clearly erroneous because not reflective of the sales opportunities of independent manufacturers of automobile air-conditioning equipment. VW and Subsidiary urge that such manufacturers may with little modification of production facilities produce units for different makes of cars.

■ The district court's failure to consider production cross-elasticity was inconsistent with the views of the Supreme Court[27] and of this circuit.[28] This is not to say that production cross-elasticity is the only factor which can be considered by the

trier of fact in defining the product market.[29]

### B. Effect of the Acquisition.

VW and Subsidiary argue that the trial court erred by relying exclusively on postacquisition changes in market shares in assessing the legality of the merger while omitting any economic analysis of its anticompetitive effect. Without accepting VW and Subsidiary's characterization of the district court's method, we agree that a more careful analysis was required.

■ The primary, though not exclusive, theory of Calnetics' § 7 attack on VW's acquisition of Subsidiary was vertical foreclosure. Foreclosure was threatened, Calnetics argued, not because VW itself was likely to satisfy its own demand from the output of the acquired firm but because VW's dealers and distributors were likely to satisfy their demand from such supply.

A threat of unlawful vertical foreclosure may exist when there is a vertical tie—such as common ownership of a customer and a supplier—for such a tie creates a danger that the normal competitive forces in the marketplace will be displaced.[30] In a vertical merger the danger is that control over both a customer and a supplier will permit the controlling party to coerce the purchasing or selling policies of the captive firm, resulting in a " 'clog on competition' * * [citation omitted]," *Brown Shoe Co. v. United States*, 370 U.S. 294, 324, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510, 535 (1962), or a "commanding position [for the controlling party] * * * not gained solely on competitive merit." *United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 605, 77 S.Ct. 872, 884, 1 L.Ed.2d 1057, 1074 (1957).

**27.** *See Brown Shoe Co., Inc. v. United States*, 370 U.S. 294, 325 n.42, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510, 535 (1962); *United States v. Columbia Steel Co.*, 334 U.S. 495, 510–11, 527, 68 S.Ct. 1107, 1115–16, 1124, 92 L.Ed. 1533, 1544–45, 1553–54 (1948).

**28.** *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 512 F.2d 1264, 1274 (9th Cir. 1975).

**29.** *See, e. g., Heatransfer Corp. v. Volkswagenwerk*, A.G., 1975–1 CCH Trade Cases ¶ 60,309 at 66,216, 66,219 (S.D.Texas 1975).

**30.** *See, e. g., Brown Shoe Co. v. United States*, 370 U.S. 294, 323–24, 82 S.Ct. 1502, 1522–23, 8 L.Ed.2d 510, 534–35 (1962); *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 174, 68 S.Ct. 915, 937, 92 L.Ed. 1260, 1301 (1948); *United States v. Yellow Cab Co.*, 332 U.S. 218, 227–28, 67 S.Ct. 1560, 1565, 91 L.Ed. 2010, 2018 (1947).

With respect to VW's wholly owned distributors, the existence of a vertical tie running from Subsidiary through VW to the distributors is clear enough. But it is not clear that VW control over the purchasing decisions of those distributors in which VW does not own a controlling interest can be properly inferred on the basis of the present record. The existence of the requisite control by VW over the purchasing decisions of Volkswagen dealers is even more doubtful in light of the district court's finding that "dealers [who buy air-conditioners from Distributor] are now, and always have been, free to purchase any type air-conditioner they desire from any source they desire."

We are confident that, on remand, the district court will properly instruct the jury on issues relating to vertical foreclosure.

## C. *Equitable Relief.*

In the event Calnetics obtains a jury verdict on its antitrust claims against VW and Subsidiary, the district court will be required to evaluate Calnetics' right to equitable relief and, if the court deems relief appropriate, fashion a suitable decree.

In order to provide the district court with guidance in the event equitable issues arise, we turn to contentions made by VW and Subsidiary with respect to the equitable relief ordered by the district court in its supplemental order of January 19, 1973. *Calnetics Corp. v. Volkswagen of America, Inc.,* 353 F.Supp. 1219 (C.D.Cal.1973).

### 1. *Divestiture.*

 The district court ordered the divestiture of Subsidiary. Under the law of this circuit, the remedy of divestiture is not available to private plaintiffs in antitrust suits. *International Telephone and Telegraph Corp. v. General Telephone & Electronics Corp.,* 518 F.2d 913, 920 (9th Cir. 1975).

### 2. *Threat of Loss or Damages Precondition to Equitable Relief under § 16.*

The district court held that, while Calnetics had not proved a causal connection between its loss of the Distributor market and the challenged merger, it was nonetheless entitled to equitable relief under § 16 of the Clayton Act because "a Section 7 *divestiture* plaintiff acts somewhat as a Rule 23 class representative and need not satisfy the requirement of 'impact' in its classical antitrust definition." *Calnetics Corp. v. Volkswagen of America, Inc.,* 348 F.Supp. at 620. (Emphasis added.) The court further stated that the proper focus was not on prospective injury to the particular plaintiff but rather on the "marketplace and the effects of the claimed anticompetitive acquisition upon the marketplace."

 Because the remedy of divestiture is not available, the correctness of the district court's view that a private divestiture plaintiff need not satisfy the traditional requirement of "impact" is moot. The general rule, as stated by *United States v. Borden Co.,* 347 U.S. 514, 518, 74 S.Ct. 703, 706, 98 L.Ed. 903, 908 (1954), controls: "Under § 16 * * * a private plaintiff may obtain injunctive relief against * * * violations only on a showing of 'threatened loss or damage'; and this must be of a sort personal to the plaintiff * * * [citation omitted]."

In evaluating the plaintiff's entitlement to relief under § 16, the proper focus is on the threat of prospective injury to Calnetics. *See Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 130, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129, 152 (1969).[31]

### 3. *The Import Ban.*

The district court enjoined VW and its wholly owned distributors for a period of seven years from importing any Volkswagens, Porsches, or Audis equipped with air conditioning installed prior to importation.

---

**31.** *See also Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 61–62, 95 S.Ct. 2069, 2077–78, 45 L.Ed.2d 12, 22–23 (1975).

VW and Subsidiary (as well as the Federal Republic of Germany) urge that this import ban offends Article 16 of the German/American Treaty of 1954,[32] and Articles I and III of the General Agreement on Tariffs and Trade (GATT),[33] because it restricts German manufacturers but not American automobile manufacturers, who remain free to sell cars with factory-installed air conditioners.

The district court was apparently of the view that the treaties had no application, *see Calnetics Corp. v. Volkswagen of America, Inc.,* 353 F.Supp. at 1222 n.5, because the relief granted did not "discriminate against the products of Germany in favor of United States producers or manufacturers." Rather, the relief granted was merely "intended to deal with and is aimed at the maintenance of a free, open and competitive market in automobile air conditioners for Volkswagen automobiles." 353 F.Supp. at 1222.

The district court apparently considered only the effect of its decree on competition within the submarket it had defined; on that basis, the decree did not "discriminate" against a German manufacturer, because the import ban was merely one of a series of restrictions aimed at controlling the purchasing and manufacturing activities of a domestic corporation, Volkswagen of America.

This reasoning is based upon an unduly limited market concept. The import ban affects not only competition for the sale of domestic automobile air conditioners but also competition for the sale of automobiles. The record demonstrates that an important factor in the sale of automobiles is the availability of integrated, factory-installed air conditioning. The ban discriminates against the German automobile manufacturer because it forbids him to sell in the United States cars with factory-installed air conditioning while imposing no similar restriction on domestic automobile manufacturers.

An exception in GATT does permit restrictive measures "necessary" to comply with United States antitrust laws.[34] But because the district court did not consider the treaties relevant, it did not attempt to justify the import ban under this exception.

Apart from treaty provisions, the effect of the import ban would be anticompetitive with respect to competition for the sale of automobiles. While courts must disregard such incidental effects in determining the illegality *vel non* of an alleged antitrust violation,[35] they should consider them when fashioning relief.[36]

Similarly, the ban will have at least a short-term anticompetitive effect with respect to competition for the sale of air conditioning equipment, because Volkswagenwerk A.G., the German manufacturer, will vanish as a potential market entrant, thus eliminating any downward price pressure the threat of its entry into the market might exert.

■ If, on remand, there is a jury verdict in favor of Calnetics on one or more of its antitrust claims against VW and Subsidiary, and if the district court makes the further determination that Calnetics is entitled to equitable relief under the traditional standards governing the availability of relief under § 16 of the Clayton Act, then the court should reassess the necessity for an import ban in light of (1) the applicability of the treaties, (2) the unavailability of the divestiture remedy, (3) the anticompetitive

---

**32.** 7 U.S.T. 1839, 1857, T.I.A.S. No. 3593 (1956). The United States as amicus takes the view that the import ban does not offend the treaty or GATT.

**33.** 61 Stat. Pt. 5, at A–5, A–12 through A–13, A–18 through A–19; T.I.A.S. No. 1700, 55–61 U.N.T.S. (1947).

**34.** Article XX(I)(d) of GATT, 61 Stat. Pt. 5, at A–61.

**35.** *Cf., United States v. Philadelphia National Bank,* 374 U.S. 321, 370–71, 83 S.Ct. 1715, 1745, 10 L.Ed.2d 915, 948–49 (1963).

**36.** The relief granted must, of course, be effective to redress the violation and restore competition. *United States v. E. I. du Pont de Nemours & Co.,* 366 U.S. 316, 326, 81 S.Ct. 1243, 1250, 6 L.Ed.2d 318, 325 (1961).

effect of the ban with respect to competition for the sale of automobiles, and (4) the anticompetitive effect of the ban with respect to competition for the sale of automobile air conditioners.

A special word is in order insofar as the district court may, on remand, contemplate reimposition of a ban on importation by VW of Porsche automobiles equipped with factory-installed air conditioning. Porsche was not a party to the proceedings below. It is an independent German corporation unrelated by ownership to any party in these proceedings. Its only connection to VW is that VW imports the Porsche product—a luxury sports car—into the United States. Elementary fairness requires that Porsche be given a chance to be heard before its importation agreement with VW is, in effect, partially voided by judicial decree.

### 4. *The Ban on Internal Expansion.*

VW and Subsidiary urge that the 10-year ban on domestic manufacture and assembly of automobile air conditioners which the district court placed on VW was unsupported by any factual conclusions or analysis.

Calnetics does not directly counter this argument in its responsive brief and reply.

The district court stated that the ban was necessary in light of the "near vacuum [of demand, presumably] created by the acquisition * * *." The ban was further justified as assisting in "the maintenance of a competitive market" and "stabiliz[ing] competition * * *" in the aftermath of divestiture. 353 F.Supp. at 1221.

■ The ban on internal expansion was intended as a supplement to divestiture relief—presumably aimed at "maintaining the divested company as a viable competitor in the marketplace without the aid of the protective practices of a parent who is its sole customer." 353 F.Supp. at 1221. Because divestiture is not an available remedy, there is scant basis for imposition of a ban on internal expansion on remand. The district court should, if the issue arises, reconsider the advisability of a ban on internal expansion in light of alternative injunctive remedies and the unavailability of divestiture.

### 5. *The Perpetual Purchase Restriction.*

■ The district court permanently enjoined VW and its wholly owned distributors from satisfying more than 50% of their air-conditioning equipment needs from the output of the divested firm. While the propriety of this particular quota is moot because of the unavailability of divestiture, we deal with the arguments relating to the 50% quota in order to guide the district court should it consider imposing a similar permanent quota on remand.

The United States virtually concedes in its *amicus* brief that the perpetual purchase restriction was error. Calnetics seeks to defend the restriction as necessary to insure that VW will not continue to buy all of its requirements from the purchaser of the divested firm. Calnetics argues that the 50% quota creates an open market for the competitors of the divested firm.

The 50% quota, however, creates the antithesis of an open market. As the district court inadvertently acknowledged, the effect of the quota is to displace the competitive forces of the marketplace and transform a segment of the automobile air-conditioning equipment business into a regulated industry. *See* 353 F.Supp. at 1223 ("The Court must therefore fashion some flexible standard by which the business needs of a buyer can be compatible with the needs of the various possible suppliers in this market.") It is inconceivable that such a quota would serve the goals of the antitrust laws, which are designed to preserve competition, not particular competitors.[37]

## IV. ATTORNEYS' FEES and COSTS.

### A. *Attorneys' Fees.*

■ The district court awarded Calnetics attorneys' fees because it had acted "in

---

37. *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510, 532 (1962).

the role of 'private attorney general' * * *." 353 F.Supp. at 1225. Such an award is now precluded by *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).

### B. Costs.

██ VW and Subsidiary argue that the district court erred in awarding the plaintiff $5,955.92 in costs for counsel's copies of depositions in contravention of a local rule of the district court which provided, with respect to deposition costs, that "[c]ounsel's copies are not taxable." Calnetics urges that the local rule was merely for the guidance of the Clerk of the Court and did not abrogate the district judge's inherent discretion. Calnetics' argument is foreclosed by *Rio Grande Irrigation and Colonization Co. v. Gildersleeve*, 174 U.S. 603, 608–09, 19 S.Ct. 761, 763, 43 L.Ed. 1103, 1105 (1899) (" 'A rule of the court thus authorized and made has the force of law, and is binding upon the court as well as upon parties to an action, and cannot be dispensed with to suit the circumstances of any particular case * * *' * * *," *quoting Thompson v. Hatch*, 3 Pick. 512, 515, 20 Mass. 512 (1827); *accord, Weil v. Neary*, 278 U.S. 160, 169, 49 S.Ct. 144, 148, 73 L.Ed. 243, 248 (1929).

Calnetics relies on *Independent Iron Works, Inc. v. United States Steel Corp.*, 322 F.2d 656, 678 (9th Cir. 1963), which held that a "trial judge [has] the power to tax the expense of * * * depositions * * [because] such power is 'implicit in 28 U.S.C.A. § 1920(2)' * * *." *Independent Iron Works* is inapposite because the cost award there did not contravene a local rule.

The award of costs for counsel's copies of depositions was error.

### V. DISTRIBUTOR'S PROPOSED COUNTERCLAIM UNDER 15 U.S.C. § 13(c).

Distributor appeals from an order of the district court denying in part a motion to amend its answer. Distributor sought to add three counterclaims. The first counterclaim was against Calnetics for breach of warranty. The second and third counterclaims were brought against Calnetics, certain officers and directors of Calnetics, and certain employees of Distributor. (Both the second and third counterclaims involve identical parties.) Additionally, both the second and third counterclaims are based on the same allegations of fact: that Calnetics paid substantial sums of money to certain Distributor employees to induce them to use their positions to see to it that Distributor purchased all, or substantially all, of its air-conditioner requirements from Calnetics.

The second and third counterclaims differ as to the nature of the damages caused, the remedy sought, and the theory of liability. The second counterclaim alleges commercial bribery in violation of § 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c). The second counterclaim alleges that this commercial bribery caused Distributor to continue to deal with plaintiff despite the inferior nature of plaintiff's product, and that this caused Distributor to suffer damages in excess of $150,000, in lost sales due to customer dissatisfaction, damages to its good will and reputation, and costs in having to repair and remedy the defective products. The third counterclaim is based on state statutory prohibitions against inducing the breach of a fiduciary relationship. The third counterclaim seeks to recover the secret profits (*i.e.*, the bribes) paid to Distributor's employees, and exemplary damages.

The district court granted Distributor's motion to amend in part, allowing the addition of the first and third counterclaims, but denying the addition of the second. The district court's order does not explain its reasons for refusing to allow the addition of the second counterclaim.

Calnetics suggests several procedural reasons: the proposed amendment was tardy, would have caused undue confusion of the issues, would have caused undue delay. But these hindsight rationalizations are not convincing in light of the district court's granting the motion to add two other counterclaims by Distributor, one of which (the third) would have posed the identical procedural problems.

We suspect that Calnetics approaches the district court's actual reason for denying Distributor's motion to add the second counterclaim when it argues in its brief:

"As the District Court pointed out to * * * [Distributor's] counsel at the hearing on the motion for leave to amend, the proposed second count (Robinson-Patman claims) failed to state a claim for recoverable damages. In its antitrust claim, * * * [Distributor] did not assert the kind of injury which has been recognized and for which damages have been recovered in 'commercial bribery' cases under Section 2(c) of the Robinson-Patman Act. * * * [Distributor] did not claim that it had been overcharged and paid excessive prices for plaintiff's products by reason of the alleged secret payments, as was the case in *Fitch v. Kentucky-Tennessee Light & Power Co.,* 136 F.2d 12 (6th Cir. 1943) * * *. And * * * [Distributor] did not and, of course, could not claim that it was precluded by a competitor from the market (in this case, itself) because of commercial bribery, as was the case in *Rangen, Inc. v. Sterling Nelson & Sons, Inc.,* 351 F.2d 851 (9th Cir. 1965) [*cert. denied,* 383 U.S. 936, 86 S.Ct. 1067, 15 L.Ed.2d 853 (1966)]."

If this is in fact the reason why the district court refused to allow the amendment (and we think it is), we believe that both the court below and Calnetics have taken too narrow a reading of the *Rangen* and *Fitch* cases as to the relief available under § 2(c).

Both *Fitch*, 136 F.2d at 15, and *Rangen*, 351 F.2d at 856–58, have held that § 2(c)'s application is not limited to situations of price discrimination, but also encompasses commercial bribery. In *Rangen* this court held:

"With regard to the legislative history, defendants cite excerpts which amply demonstrate that, in enacting section 2(c), the prime concern of Congress was to curtail price discriminations accomplished by pseudo-brokerage arrangements. The Supreme Court, in *Federal Trade Comm'n v. Henry Broch & Co.,* 363 U.S. 166, 169, 88 S.Ct. 1158, 4 L.Ed.2d 1124, noted this principal legislative concern. But, in a footnote (page 169), the Court also expressed the view that the legislative history demonstrates a Congressional intent to proscribe other practices such as the bribing of a seller's broker by the buyer * * * [footnote omitted].

"This view is further borne out by the statement in the House Report, quoted below, indicating that Congress was concerned with preserving the fiduciary relationship between a broker and his client * * * [footnote omitted].

" * * *

" * * * In our case the bribery not only undermined a fiduciary relationship which Congress sought to protect, but gave one seller a grossly unfair advantage over a competing seller. Where commercial bribery is associated with evils which a particular provision of the antitrust laws was designed to prevent, the fact that it was bribery rather than a more defensible arrangement ought not to preclude application of the statute." 351 F.2d at 856–57.

The alleged violations in the instant case no less involve the undermining of fiduciary relationships than did those in *Fitch* or *Rangen*. We hold that, if distributor is able on remand to prove that counterdefendants indeed committed acts of commercial bribery in violation of § 2(c), then the defendants ought to be allowed any damages proximately caused by that violation.

The district court erred in denying Distributor's motion to amend its answer to add the second counterclaim.

## VI. CONCLUSION.

The claims and counterclaims discussed above are remanded for further proceedings consistent with the views expressed herein.